J-S06015-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| C.B-R., | IN THE SUPERIOR COURT OF<br>PENNSYLVANIA |
| Appellee | |
| v. | |
| D.B., | |
| Appellant | No. 2411 EDA 2014 |

Appeal from the Order entered July 24, 2014,
in the Court of Common Pleas of Bucks County,
Domestic Relations Division, at No(s): A06-07-62620-C

BEFORE: BENDER, P.J.E., LAZARUS, and FITZGERALD[*], JJ.

MEMORANDUM BY BENDER, P.J.E.: **FILED MARCH 04, 2015**

D.B. ("Father") appeals from the order issued by the Court of Common Pleas of Bucks County that granted the emergency petition to modify the existing custody order filed by C.B-R. ("Mother"), with respect to the parties' female child, L.B. ("Child"), born out-of-wedlock in October of 2001. We reverse and remand in accordance with the following decision.

We summarize the factual and procedural history as follows. Pursuant to an agreed-upon custody order in 2007, Mother and Father exercised shared legal and physical custody of Child on an alternating weekly basis.[1]

---

[*] Former Justice specially assigned to the Superior Court.

[1] Mother acknowledged on cross-examination that she filed a custody complaint in 2007 seeking primary physical custody of Child, which resulted in the agreed-upon order. Mother also acknowledged that she sought

On April 11, 2014, Mother filed an emergency petition to modify custody wherein she requested shared legal and sole physical custody of Child. Mother's petition, 4/11/14, at 3 (unpaginated).[2] Mother alleged, in part, that Child has "a very contentious relationship with" Father's wife, B.B. ("Stepmother"), and "has started cutting herself because she becomes extremely anxious before and after visitation with" Father. *Id.* at ¶ 16. In addition, Mother alleged, in part, that Father "is uncooperative with getting the child counseling. . . ." *Id.* at ¶ 16(g).

On May 7, 2014, Father filed a petition to modify the existing custody order wherein he requested primary physical custody. Father alleged, in part, that Mother repeatedly engages in conduct "meant to sever" Child's relationship with him, and that Mother is "unable to ensure that [Child] is either in school, or on time for school." Father's petition, 5/7/14, at ¶ 6.

Following a custody conciliation conference, a hearing on the petitions occurred on May 7, 2014, July 17, 2014, and July 24, 2014. The court received testimony from the following witnesses: Mother; Father; S.B., Child's half-sister; C.R., Child's half-brother; S.S., Father's ex-wife; and Child, *in camera*.

---

primary physical custody again in 2010, but that the parties ultimately kept the same custody arrangement. N.T., 5/7/14, at 33-34.

[2] In contrast, in paragraph sixteen of the same petition, Mother alleges "it would be in the best interest of the child to be in the primary physical and sole legal custody of" Mother. Mother's petition, 4/11/14, at ¶ 16.

With respect to the parties' households, Mother testified she resides with her parents in their home along with her three young-adult sons, C.R., P., and S., Child's half-brothers. N.T., 5/7/14, at 33. Mother's bedroom is located in the finished basement of the home, which Child and C.R. share with her, and Mother testified that P. and S. "have bedrooms upstairs." *Id.* at 33. Father testified he resides in a five-bedroom house with Stepmother, to whom he has been married for seven years. *Id.* at 45. Father testified Child has her own bedroom on the first floor, which is located next to the bedroom of his nineteen-year-old daughter, S.B., Child's half-sister. *Id.* Residing in Father's home also is his younger son and daughter, ages four and five, born during his marriage to Stepmother, as well his two young-adult stepdaughters.[3] *Id.* at 46, 77.

Mother testified that, toward the end of February of 2014, Child, who was then age twelve and in the sixth grade, admitted to her that she was "cutting" herself. N.T., 5/7/14, at 8, 16-17. Mother testified that Child's "demeanor changed. She was very secretive, very quiet, started wearing long sleeves all the time, wearing leggin[g]s, jeans, even to bed." *Id.* at 8. Father testified that Mother informed him of Child "cutting" herself after Child's temporary suspension from school,[4] which was approximately three

_____

[3] In her *in camera* testimony, Child agreed with the court that her parents' homes are a driving distance of "a few minutes." N.T., 5/7/14, at 3.

[4] Mother testified that, after she learned that Child had been "cutting," Child received a two-day out-of-school suspension and a one-day in-school

to four weeks before the start of the custody hearing. N.T., 5/7/14, at 54-57. Father testified Mother also informed him at the time that Child had been depressed "for two months prior. . . ." *Id.* at 56. Father testified he had no knowledge of Child's depression and/or "cutting" because Child "comes over [to his house] with a smiling face, happy. She seems to be happy. . . ." *Id.* Further, Father described Child's demeanor in his household as "happy-go-lucky." *Id.* at 47.

Mother testified that, upon learning of Child "cutting," she "started looking into finding a therapist for her." N.T., 5/7/14, at 9. Mother testified that, upon the recommendation of her doctor, she contacted Family Services of Bucks County for treatment of Child. *Id.* Mother testified that she asked Father to consent to therapy for Child; however, by April 23, 2014, the date of the custody conciliation conference, Family Services had not received Father's consent. *Id.* at 11-12.

Father testified that, approximately two weeks after learning that Child was "cutting" herself, Child provided him with the consent form for treatment at Family Services. N.T., 5/7/14, at 128. Father testified he signed the consent form within two days of receipt at the office of his trial counsel, but, for an unknown reason, Family Services did not receive the

---

suspension for bringing a razor to school on one occasion. N.T., 5/7/14, at 10. Mother acknowledged on cross-examination that Child's suspension occurred during her week of custody, and that she told Father by telephone about the suspension "the day after. . . ." *Id.* at 24.

-4 -

paperwork. *Id.* at 59-61, 129. Thereafter, Father visited the offices of Family Services and signed the consent form again. *Id.* at 60. Mother testified that Child had her first appointment at Family Services on May 6, 2014, the day before the start of the custody hearing. *Id.* at 16.

Father testified that he intends to pursue counseling for Child. N.T., 5/7/14, at 61. On the second day of the custody hearing, July 17, 2014, Father testified that, since the first day of the hearing in May, he had participated in two sessions with Child at Family Services, and he had simultaneously started treatment for Child with another provider, Dr. Feinstein.[5] N.T., 7/17/14, at 33-34.

It is undisputed that Child is not doing well academically. Mother introduced two separate letters from two of Child's teachers during the 2013-2014 school year revealing that her academic progress has steadily decreased starting in the late Fall. *See* Mother's Exhibits 1 and 2. Moreover, the record supports the finding of the trial court that "Mother at times took [Child] out of school on a whim, which has certainly affected her academic performance." Trial Court Opinion, 9/22/14, at 19.

---

[5] Father testified he had temporarily suspended Child's visits with Dr. Feinstein because Child's health insurance, which Mother provided, had lapsed. N.T., 7/17/14, at 35-36. Father testified he learned it lapsed upon taking Child to an emergency dental visit. *Id.* at 34. In addition, Family Services informed Father that Child was without health insurance. *Id.* Father testified that Child is presently covered under Stepmother's health insurance benefits. *Id.* at 36.

Father testified that Child has had poor school attendance during Mother's custodial weeks since second grade. N.T., 5/7/14, at 85. Further, Father testified he viewed Child's attendance on the school website from September of 2013, until April 20, 2014, and learned that Mother has removed Child from school during his custodial weeks without his knowledge. He testified, in part, "I'm trusting that [Child] is in school getting the education, and she is not in school, and her report card reflects that her afternoon classes are not doing [sic] the greatest because she's not in school to get the work done because mom keeps pulling her out for unknown reasons." *Id.* at 87. Specifically, Father testified that Child's afternoon classes are science, math, and social studies, in all of which Child received a grade of D on her report card. *Id.* at 88.

Child testified *in camera* in the presence of the parties' counsel on May 7, 2014, and again on July 17, 2014. Child showed the court her scars from "cutting" located above both of her knees and on her left arm. N.T., 5/7/14, at 5. She testified she performed "cutting" mostly at Father's house and one time at Mother's house. *Id.* at 38. On direct examination by Mother's counsel, Child testified:

Q. Can you talk to the judge about what it is you've been feeling that led you to do that?

A. Well, at my Dad's house I have been feeling like I am almost depressed, like disrespected, and yet, like, almost suicidal, like how much my stepmom, she criticizes me. And my sister, my one sister, she completely ignores me.

- 6 -

THE COURT: Which sister is that?

A. [Sa].[6]

N.T., 5/7/14, at 6.

Mother's counsel subsequently questioned Child about a statement she made regarding Stepmother in a handwritten letter dated April 22, 2014, that she wrote the night before the conciliation conference, which she testified she wrote so as "to prove . . . why I want to live with my mom, not my dad."[7] *Id.* at 9. Child's testimony continued,

> Q. In that letter you said that your stepmom always has something to say about the way you look.
>
> A. Yeah, always something about my appearance. She said – I was wearing something. It was, like, a long time ago. I was wearing something that I liked, and she is, like, why are you wearing that? It's hideous. And I was, like, because I want to. And then that was the end of that.
>
> And then one day it was my sister, [S.B.]'s graduation. . . . [] I just got home from school . . . starting to get ready, and my hair was messed up when I got home. I had it in a ponytail. It frizzed out. She said, your hair looks disgusting. You better not wear it like that. I was in a rush. I was, like, are you serious? She always has something to say, different things, like my appearance, and sometimes how I act, or the way my mom lives.

*Id.* at 9-10. Further, Mother's counsel questioned Child regarding her statement in the same letter that "they also make me think of suicidal thoughts a lot when I'm over there [at Father's house]." *Id.* at 23. Child

---

[6] Sa. is one of Father's young-adult stepdaughters residing in his home.

[7] The handwritten letter is included in the certified record. N.T., 5/7/14, at Mother's Exhibit #5.

again explained that these thoughts are due to Stepmother "judging me."

*Id.*

With respect to Child's statement in the same letter that no one gets along in Father's house, Child explained, "Well, when someone says something, we automatically get judged. Like, I don't say anything. I ignore what people say. I actually just walk on eggshells." *Id.* at 12. Child continued on direct examination,

> Q. You said in that letter they make me feel useless, worthless, and ugly. Can you describe that to the judge?
>
> A. Well, they make me feel as if I'm, like, the third wheel of all of them, because my one stepsister, [Sa.], she gets practically everything she wants. And then my [ ] stepsister [Am.], she does the same. And [S.B., Father's nineteen-year-old daughter], she doesn't really. Like, she, usually, [S.B.], she gets moody, and sometimes she says stuff that she doesn't mean, like, . . . you are ugly. . . .

N.T., 5/7/14, at 22. Moreover, Child testified upon inquiry by Father's counsel that she visited the law office of Mother's counsel approximately one month before the start of the hearing and talked about the following:

> We talked about my cutting and why I started cutting, which was because of my dad's house, and how I want to live with my mom not my dad, not because I hate my dad. It's more because I feel safer. I feel, like, more loved in a more calmer environment. It's more comfortable.

*Id.* at 31.

Father's counsel questioned Child as follows:

Q. [ ] [D]o you ever have good times with dad?

A. Yeah, when it's just him and I, though.

-8-

Q. Not with the rest of the family?

A. No, yeah, not with the rest of them.

*Id.* at 41-42.

Finally, with respect to her custody preference, Child stated, "I want to live with my mom. . . . Not my dad. Like, I would rather, like, see my dad every other weekend, you know, something like that, but, like, not every other week like we are now." *Id.* at 42. On her second day of *in camera* testimony, Child specified, "I want to live with my Mom and see my Dad every weekend or every other weekend. And during the week if he wants to have dinner or go out for ice cream, he could call up." N.T., 7/17/14, at 92.

At the conclusion of the hearing, the trial court issued an order on the record in open court granting Mother sole legal and sole physical custody of Child, with no custody time allotted for Father. *See* N.T., 7/24/14, at 49-66. Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for our review:

[1.] Can facts and circumstances prior to the entry of an existing custody order constitute a change in circumstances justifying modification of the existing custody order? Particularly, do Protection from Abuse ("PFA") petitions and other related criminal charges, from twelve (12) years prior to the date of the applicable hearings in this case and prior to the award of both primary and equal shared physical custody to the PFA defendant (after custody evaluations and full hearings), justify denying the PFA defendant, a natural parent, from having any custodial rights?

-9-

[2.] Did the evidence presented at trial support the conclusion that it would be in the minor child's best interests to have no relationship with her father?

[3.] Can evidence outside of the record support a custody determination?

[4.] Can a minor child's testimony be worthy of weight and consideration, but the minor child's preference be rejected entirely?

Father's brief at 12.

The scope and standard of review in custody matters is as follows.

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

*R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting *Bovard v. Baker*, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.
>
> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful

and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr., supra* at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014).

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citing *Arnold v. Arnold*, 847 A.2d 674, 677 (Pa. Super. 2004)).

Instantly, because the custody trial commenced in May of 2014, the Child Custody Act ("Act"), 23 Pa.C.S. §§ 5321–5340, is applicable. *See C.R.F. v. S.E.F.*, 45 A.3d 441, 445 (Pa. Super. 2012) (holding that, if the custody evidentiary proceeding commences on or after the effective date of the Act, *i.e.*, January 24, 2011, the provisions of the Act apply). Section 5328 of the Act provides an enumerated list of factors a trial court must consider in determining the best interests of a child when awarding any form of custody:

**§ 5328. Factors to consider when awarding custody.**

   **(a) *Factors.*** – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

-11-

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).[8]

This Court has stated that, "**[a]ll** of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." **J.R.M. v. J.E.A.,** 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original). Further,

> Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328 custody] factors prior to the deadline by which a litigant must file a notice of appeal." **C.B. v. J.B.,** 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013). . . .
>
> In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." **M.J.M.**

---

[8] The Act was amended, effective January 1, 2014, to include the additional factor at 23 Pa.C.S. § 5328(a)(2.1).

> *v. M.L.G.,* 63 A.3d 331, 336 (Pa. Super. 2013), *appeal denied,* [620 Pa. 710], 68 A.3d 909 (2013). A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). *Id.*

*A.V.*, 87 A.3d at 822-823. With these standards in mind, we now turn to the merits of this appeal.

The crux of Father's issues on appeal is that the competent record evidence does not support the subject order denying all of Father's custodial rights, both legal and physical. Father argues that the court erred by relying on evidence outside of the record to support its decision. In addition, Father contends the court erred by basing its custody decision on allegations in the Protection from Abuse ("PFA") petitions filed in 1993, and between the years 2000 to 2002, by his ex-wife, S.S. Father also argues the court erred by basing its decision on the testimony of C.R., Mother's nineteen-year-old son, regarding an incident that allegedly occurred twelve years ago. Moreover, Father contends the court erred by basing its decision on Father's criminal record from the year 2000. Finally, Father argues the court abused its discretion by finding Child's custody preference well-reasoned, but issuing an order that was contrary to her preference to see Father on weekends and one night during the week. Father requests this Court reverse the order and remand the case for the trial court to issue an *interim* custody order and direct that the parties and Child participate in a custody evaluation. Upon careful review, we are constrained to agree.

The certified record is devoid of any medical or psychiatric evidence regarding why children in early adolescence may "cut." In addition, there is no medical or psychiatric evidence in the record relating specifically to Child's reasons for "cutting." Nevertheless, the court stated on the record at the conclusion of the hearing as follows:

> I am not a psychologist, but usually when you see [ ] [cutting] it is among females, and any doctor will tell you that it expresses a fear of abandonment. The child tends to believe that she lacks the nurturing and support that she's entitled to. So she damages herself because this impulse can't be acted out against a parent.
>
> So you will see children cut or burn and perhaps the self-mutilation, according to the literature, is a result of this feeling of emptiness and interpersonal stress. Usually, as psychiatrists will tell you, the child feels that a parent or a caregiver is neglectful or withholding of affection.
>
> And we know that girls who tend to be cutters are more prone to an actual successful attempt. It might be an attempt to cry out now, but as she gets older it might be an attempt at suicide.

N.T., 7/24/14, at 51.

In its Rule 1925(a) opinion, the trial court responded to Father's assertion that the foregoing statement was based on information not a part of the record. The court considered its statement "harmless," and reasoned as follows:

> The properly admitted evidence, such as [Child]'s testimony that she does not feel loved by Father and feels "almost suicidal," supports our primary conclusion that [Child]'s psychological issues, *i.e.*, her self-mutilation and suicidal thoughts, manifest when she is with Father during his custody time. Thus, the prejudicial effect of this statement and any alleged reliance in, or citation to, a psychological report is minimal.

Trial Court Opinion, 9/22/14, at 23.

Upon careful review, we are constrained to disagree that Child testified she does not feel loved by Father. Indeed, on her second day of *in camera* testimony, Child testified that things are "pretty good" between her and Father since the first day of the hearing, that she and Father "go fishing quite a lot," and that they frequently text message each other. N.T., 7/17/14, at 86, 101. Child also testified that she went fishing two weeks ago with Father and Stepmother on Father's boat, and she agreed that she had a good time. *Id.* at 101. Significantly, Child testified that she has not thought about "cutting" herself again, and she agreed that her counselor is helping her. *Id.* at 96. As such, to the extent the court relied on a generalized psychological report about the reason why females "cut" that was not admitted as evidence in this case, it committed an error of law. In addition, even if the record included medical or psychiatric evidence to support the court's foregoing statement, such evidence, in and of itself, would not support the court's conclusion that removing Father completely from Child's life will serve her best interests.

Father also argues that the court erred in basing its custody decision on his alleged past behavior. Specifically, Father challenges the following conclusions made by the court and directed, in part, to S.S., Father's ex-wife, when it issued its decision:

-16-

> You lived and tolerated [Father]. And again, because I can't emphasize it enough, he's a mean, belligerent drunk. Now, did this happen when he was younger? Yes. Did it happen one time? No. It's a constant. And the best predictor of future behavior is past performance.
>
> [Father], I don't think you're a bad guy in toto. You just have some issues. But I'll tell you this. I was a DA for many years and I never saw a guy who fought the cops and won. Mike Tyson could fight the cops. He's going to lose. Muhamm[a]d Ali could be his partner. They're going to get the crap beat out of them.
>
> That tells me a lot about you. I'm not going to have this child exposed to that. It may not happen now, but it is more likely than not that it will.

N.T., 7/24/14, at 53.

The relevant testimonial evidence is as follows. Father presented the testimony of S.S., his ex-wife, who testified that she and Father lived together for fifteen or sixteen years, but were married for only one or two years, in or around the year 2000. N.T., 7/24/14, at 4. S.S. and Father have two young-adult children, a male and a female, of whom Father had primary physical custody after his divorce from S.S. *Id.* at 6. S.S. testified as follows regarding Father's former primary physical custody of their children, "I wouldn't change it. I would not change it. Our children have turned out great. . . ." *Id.* S.S. described Father as "a great father." *Id.*

On cross-examination, S.S. acknowledged filing a PFA petition against Father in 1993, wherein she alleged Father physically abused her and her

son from a prior marriage, Sn.[9]  N.T., 7/24/14, at 17-21.  S.S. testified that she did not appear in court for the hearing on her PFA petition, and she implied that no order went into effect as a result.  *Id.* at 22.

S.S. testified on cross-examination that she filed a second PFA petition in 2000 alleging three incidents of physical abuse by Father against her between July and early August of 2000.  N.T., 7/24/14, at 22-24.  S.S. also alleged that Father, for the last eight months, had been drinking to excess on weekends "along with prescription meds and recreational drugs."  *Id.* at 22.  S.S. testified that, on August 5, 2000, she called the police due to her altercation with Father, and Father was arrested and charged with aggravated assault and resisting arrest.[10]  *Id.* at 24.  The record reveals that Father pleaded guilty to aggravated assault against S.S., and he was placed on county probation for eighteen months.  *Id.* at 36; *see also* Mother's Exhibit #4.

---

[9] The record does not reveal the age of Sn.

[10] Mother's counsel introduced into the record during S.S.'s testimony a police criminal complaint dated August 5, 2000, alleging the crimes of assault and resisting arrest against Father.  N.T., 7/24/14, at 27.  To the extent Father argues that the court erred in overruling his objection to the police complaint as hearsay evidence, we do not consider this argument because Father failed to raise it in his Statement of Questions Involved in his brief.  *See M.J.M. v. M.L.G.,* 63 A.3d 331, 337 n. 7 (Pa. Super. 2013) (stating that issues not included in the statement of questions involved in an appellant's brief are waived).

S.S. testified on cross-examination with respect to the final PFA petition she filed against Father relating to an incident on January 1, 2001, when she alleged that Father again physically abused her son, Sn., and two incidents later that same month when Father physically threatened her and one incident when he shoved her. N.T., 7/24/14, at 36-39. S.S. acknowledged on cross-examination that Father received an indicated report from the Bucks County Children and Youth agency for the physical abuse against Sn. that she alleged in her PFA petition. *Id.* at 40.

Significantly, on redirect examination, S.S. testified that Father was granted primary physical custody of their two children while he was on probation. N.T., 7/24/14, at 43. S.S. also expressed regret for the allegations she made in the PFA petitions. *Id.* at 42. She testified as follows on redirect examination:

Q. And today would you call [Father] a dangerous and calculating man?

A. Absolutely not.

Q. And today do you have any concerns about [Father] and his parenting?

A. Not at all. . . .

Q. Today do you have any concerns about his abuse or tendency towards violence?

A. No, I do not.

Q. And do you trust [Father] with your children?

A. I do.

*Id.* at 45.

Upon careful review of the competent record evidence, we conclude that the court erred and abused its discretion in finding that Father is "a mean, belligerent drunk." There is no record evidence that Father presently or at any time during Child's life has had a drug and/or alcohol problem. In addition, we conclude that the court erred and abused its discretion in finding that Father has "some issues," ones that the court will not "expose" Child to, based on the allegations from the police complaint filed in the year 2000 including allegations of Father's resisting arrest.

In considering the allegations against Father in the PFA petitions and in the police complaint, as well as Father's guilty plea in the year 2000, the court reasoned, "the best predictor of future behavior is past performance." N.T., 7/24/14, at 53. We reject the court's reasoning as contrary to the well-settled principle that, "custody cannot reasonably be granted on the basis of a parent's 'unsettled past' unless the 'past behavior had an ongoing negative effect on the [child's] welfare.'" *Hartman v. Hartman*, 476 A.2d 938, 941 (Pa. Super. 1984) (citing *In re Leskovich*, 385 A.2d 373, 377 (Pa. Super. 1978)). There is no record evidence in this case that Father's past behavior had an ongoing negative effect of this kind upon Child as Child did not allege physical abuse against her by Father, and she did not express fear of Father.

To the extent the court found that Father continued to exhibit violent tendencies toward his family, we conclude the record does not support this finding. The court cites the testimony of C.R., the nineteen-year-old son of Mother, which indicated that approximately twelve years ago, an incident occurred at the dinner table when Father "got angry at my brother, [S.], and he threw a fork at him. Just missing his head by an inch." N.T., 7/17/14, at 58-59. C.R. also testified that "[t]here were a few other times with his son, [B., the son of Father and S.S.], where he g[o]t into a fight and just [would] be very aggressive and yelling all the time." *Id.* at 59. We conclude that this testimony relates to Father's "unsettled past[,]" which, as we stated above, does not have an ongoing negative effect upon Child. Further, although Child testified that Father slapped her face and her hands when she was in third or fourth grade after questioning her about her diary entry wherein she called Stepmother "a bitch," this testimony by Child represents an isolated event based upon our review of the record. N.T., 7/24/14, at 108-109; N.T., 5/7/14, at 18. Therefore, to the extent the court found Father continues to exhibit violent tendencies toward his family, we conclude that the court abused its discretion.

Finally, with respect to Father's argument that the court erred in issuing a custody order that was contrary to Child's preference, we conclude the court abused its discretion to the extent it based its decision on finding that Child wanted to live with Mother to the exclusion of ever seeing Father.

-21-

The court stated in its Rule 1925(a) opinion that Child "exhibited a high level of maturity and intelligence. We also found her very credible and forthright. She clearly expressed her desire to live with Mother. . . ." Trial Court Opinion, 9/22/14, at 24. In addition, the court stated that Child "during two *in camera* sessions on separate occasions, indicated that she wanted to live with only Mother." *Id.* at 20. In its Rule 1925(a) opinion, the court omits any reference to Child's preference stated during her *in camera* testimony. On both occasions she indicated that she would like to see Father on weekends and even once during the week "if he wants to have dinner or go out for ice cream. . . ." N.T., 7/17/14, at 92. Further, the court omits any reference to Child's testimony that she has a good time with Father when she is alone with him. N.T., 5/7/14, at 41-42.

> The court ultimately determined as follows:
>
> We considered [Child]'s wishes in conjunction with all the evidence presented. . . . As we stated in our Order, this court was troubled with the possibility that if the custody situation did not change, she may harm herself more severely.

Trial Court Opinion, 9/22/14, at 25. Because we conclude the court abused its discretion in interpreting Child's preference as wanting to live with Mother to the exclusion of partial physical custody for Father, and in relying on the evidence discussed above relating to Father's "unsettled past," it follows that the court's determination to grant Mother sole physical custody is not supported by the record. Moreover, we conclude there is no record evidence that Child may harm herself more severely if the court did not grant Mother

sole physical custody. Indeed, on the second day of the hearing, Child testified that she has not "cut" or thought about "cutting" again, that counseling was helping her in this regard, and she agreed that she had a good time while recently fishing with Father and Stepmother. N.T., 7/17/14, at 86, 96, 101. As stated above, to the extent the court relied on a psychological report not a part of the record that "cutting" may lead to Child harming herself more severely, the court committed an error of law.

Therefore, upon thorough review, we conclude that the competent evidence of record does not support granting Mother sole physical custody. Accordingly, we reverse the order with regard to the award of sole physical custody, and direct the court to issue an *interim* order granting Mother primary physical custody, and Father partial physical custody, exercised exclusively by him outside the presence of the members of his household. **See M.A.T. v. G.S.T.**, 989 A.2d 11, 21 (Pa. Super. 2010) (*en banc*) (stating that, where the record is sufficiently developed, we may substitute our judgment for that of the trial court and decide the case on the merits).

Based on the foregoing, we likewise conclude that the court abused its discretion in granting Mother sole legal custody. The Act defines "legal custody" as "[t]he right to make major decisions on behalf of the child, including, but not limited to, medical, religious and educational decisions." 23 Pa.C.S. § 5322. Section 5328(a)(13) addresses the level of conflict between the parties and the willingness and ability of the parties to

cooperate with one another. In this case, the trial court failed to make any findings with respect to the conflict, if any, between the parties. Moreover, we conclude that the competent evidence of record does not support the court's decision to grant Mother sole legal custody when the record demonstrates that Mother has a history of permitting Child to have a poor school attendance record and allowed Child's health insurance to lapse. Accordingly, we reverse the order with regard to the award of sole legal custody, and direct the court to issue an *interim* order granting the parties shared legal custody. **See M.A.T. v. G.S.T.**, **supra**.

Accordingly, we reverse the custody order with regard to the sole legal and sole physical custody award. We remand this matter to the trial court to fashion an *interim* custody order granting the parties shared legal custody, Mother primary physical custody, and setting forth a partial physical custody schedule for Father exercised exclusively by him outside the presence of the members of his household. In addition, the trial court shall order the parties to continue treatment for Child at Family Services of Bucks County and any other psychological or psychiatric professional service they may agree upon. Finally, the trial court shall order Mother, Father, Stepmother, and Child to participate in a custody evaluation with a mutually agreed-upon evaluator or one appointed by the court if the parties do not agree to an evaluator in prompt fashion, and schedule a new custody hearing upon receipt of the custody evaluation. Upon entering a final custody order, the court shall set

forth its mandatory assessment of the statutory best interest factors pursuant to 23 Pa.C.S. § 5328(a).

Order reversed. Case remanded for proceedings consistent with this Memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/4/2015